# Appeal of Holt, Harris and Humes.

1. Where articles of agreement are entered into for the sale of land, the purchase-money to be secured and the deed to be executed and delivered within a fixed time, the vendees are not entitled, after having allowed more than the fixed period to elapse, to make such tender and demand, and, on the vendor's failing to execute and deliver the deed at once, to rescind the contract. The vendees must in such case give the vendors full notice of their intention, and cannot rescind until after the expiration of a reasonable time for performance.

2. Where tenants in common execute a deed of land, the consideration for which is fully paid by the vendee, the delivery of said deed after the death of one of the tenants in common, by the other, or by some other person in whose hands it has been placed for that purpose, is a good and lawful delivery.

3. Where real estate is conveyed to persons who are partners, the face

[Holt's Appeal.]

of the conveyance determines as to judgment creditors the nature of the title. When, therefore, real estate is conveyed by articles of agreement to partners, as tenants in common, judgments entered against the individual partners will take effect as a lien on their interest in the land. No parol testimony to the effect that the property was bought for the firm, with firm assets, and actually used by the firm, will alter this result.

4. The fact that one of the partners did not sign the articles of agreement will not be effectual to raise a resulting trust in the remaining partners for the firm, and so take the case out of the rule above laid down, where it appears that such non-signing partner was distinctly named as a vendee in the articles of agreement, and that he ratified and approved the act of his associates in entering into such articles.

5. Where a decree for specific performance is entered of a contract by said partners for the sale of said land, provision should be made for the payment of the judgments which have been entered against the individual partners subsequent to the date of their acquiring the equitable title, and prior to the date of their contract to sell the same.

6. Where A. agrees by articles of agreement to execute to B. a good and sufficient deed for real estate, and then B. agrees with C. to convey all his right, title and interest in the land to him, C. is entitled to demand of B. conveyances which will vest as good, perfect and sufficient a title as A. agreed to confer upon B.

7. Where a tract of land was originally surveyed in a block with other tracts, and from fixed monuments upon the ground, and other circumstances, it appears probable that there is a serious interference between the various tracts, the title will not be deemed good and marketable so as to entitle a vendor thereof to a decree for specific performance of a contract to sell the same.

8. Calls for adjacent surveys and the notation of waters are not the best evidence of a survey, but they are, nevertheless, corroborative, and may help to settle a doubt as to the true location of a tract of land.

June 3d 1881.  Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.

APPEAL of J. W. Holt, John P. Harris and W. P. Humes, Jr., from a decree of the Court of Common Pleas of *Centre county:* In Equity. Of May Term 1881, No. 164.

Bill in equity, filed February 19th 1877, between E. R. Payne, W. H. Armstrong, Henry B. Smith and Edmund Blanchard, partners, trading under the firm name of E. R. Payne & Co., and William Young, complainants, and J. H. Holt, W. P. Humes, Jr., and John P. Harris, defendants, praying a decree for the specific performance of a contract for the sale of real estate, wherein the complainants were vendors and the defendants vendees.

The defendants filed an answer and the cause was referred to W. C. Kress, Esq., as examiner and master, who found the material facts to be substantially as follows :

(1) In 1871, the complainants, Payne, Armstrong, Smith and Blanchard, by verbal agreement entered in a copartnership under the firm name of E. R. Payne & Co., for the purpose of manufacturing and selling lumber. E. R. Payne was the active partner, to whom the general management of the business was intrusted.

(2) On December 24th 1872, the complainant, William Young, by articles of agreement, agreed to sell and convey to the complainants Payne, Armstrong, Smith and Blanchard, their heirs and assigns, in fee simple, clear of all incumbrances, three certain tracts of timber lands situate in Centre county, surveyed in the warrantee names " Nathaniel Levy," " Joseph Thomas " and " Jacob Waln " respectively, each containing 415 acres and allowance, for the consideration of $24,000, to be paid in installments. The articles contained no precise description of said tracts. All the partners signed this agreement except Edmund Blanchard. During the negotiation of this transaction, it was understood between Mr. Payne and Mr. Young that the purchase was made by the firm of E. R. Payne & Co., and certain notes and a check of that firm were given in part payment of and to secure the said consideration. Blanchard was informed by Payne of the purchase, as that of the firm, and he recognized it as such.

(3) The firm of E. R. Payne & Co. afterwards determined to close up their lumber business and to sell their lands. On September 17th 1875, by articles of agreement under seal of that date, the said firm and the several members thereof acting by Blanchard, one of the firm, agreed to sell to the defendants Holt, Harris and Humes " all the right, title, and interest of the said E. R. Payne & Co.," in the said three tracts of land, purchased by E. R. Payne & Co. from William Young, for the consideration of $22,000, payable as follows : $5,500 on June 1st 1876, with interest from date, and $5,500 on the first days of June 1877, 1878, and 1879. " Deed to be given and payments to be secured within thirty days." The payments were not secured within the thirty days, nor was a deed offered or asked for. The vendees went into possession and cut a large quantity of timber, worth, as the master found, $3,068.16.

(4) On June 1st 1876, the day when the first installment fell due, Holt, Harris, and Humes called at Blanchard's office, but Blanchard was absent. They stated to the person in charge that they had come to fulfill their contract with E. R. Payne & Co., by paying the first installment of purchase-money and securing the balance, and to obtain a deed. They exhibited the money and a bond. Owing to Blanchard's absence, nothing further was done. On June 3d 1876, they called again, and,

finding Blanchard, tendered him $5742, and the bond to se-
cure the balance of purchase-money.    Blanchard declined to
take the money, and said he was not prepared to make a deed.
Harris then informed Blanchard that they (the defendants)
elected to rescind the contract, and he tendered Blanchard
$1,825 for timber cut, and informed him that they delivered
up possession of the land.    Blanchard replied that if they
wanted to make a tender and demand a deed, they must go
to E. R. Payne & Co.    On June 7th 1876 Humes called on E.
R. Payne, made a similar tender and demanded a deed.    Payne
replied that he was willing to receive the money but was not
ready to make a deed; that the deed was to come from William
Young, and it would be ready in a few days.    Humes then in-
formed Payne that they (the defendants) elected to rescind the
contract. Humes called the same day at the office and residence
of William Armstrong, for a similar object, but failed to find
him.

(5) On July 15th 1876, Payne tendered to Harris a deed
from William Young to E. R. Payne & Co. and a deed from E.
R. Payne & Co. to Holt, Harris and Humes for the said three
tracts, both dated June 26th 1876.    This was refused on the
grounds that the contract had already been rescinded; that the
title of Blanchard and Armstrong was encumbered with judg-
ments, standing against them; and that Young had title only
to five-sixths, the title to one-sixth being outstanding in C. C.
Hand and S. B. Costen.

In relation to Young's title, the master reported the facts to be
as follows:

In 1872, Young, being the owner of the whole of the lands,
conveyed one-sixth of them to Hand and Costen.    Young
afterwards, in 1872, purchased from them this one-sixth, paid
the consideration, and a deed was executed and acknowledged
by Hand and wife, and Costen and wife, to Young for the same.
Young saw the deed about the time it was executed, but for
some reason it was not then delivered to him.    On July 15th
1876, when the above-mentioned tender of deeds was made to
the defendants, this deed from Hand and Costen to Young had
not been delivered to the latter.    In the meantime, Hand had
died.    This deed for the one-sixth afterwards came into the pos-
session of Young, and was recorded October 13th 1876.    The
master held that the delivery of the deed after the death of one
of the grantors, under the circumstances, passed a good title to
Young to the said one-sixth.

The plaintiff subsequently tendered to the defendants and
filed with the master, a deed from William Young and wife to

the defendants, for the three tracts in question. This was re-
fused on the same grounds on which the former tender of deeds
had been refused.

The defendants subsequently set up as a defense before the
master, that the three tracts in question are so interfered with
by other surveys of the same large block of surveys in which
the tracts in question were comprised, that as to a large portion
of them the complainants cannot make a good and marketable
title.

The master was directed by the court to take additional evi-
dence and report on the question of interference.

(6) On August 4th 1876, E. R. Payne & Co. by writing un-
der seal, assigned to William Young all their right, title and
interest under the articles of agreement of September 17th
1875, between the said E. R. Payne & Co., and Holt, Harris
and Humes. The master found that this assignment was in
pursuance of an agreement made on or before July 7th 1876, by
which Young was to receive the purchase-money due by Holt
*et al.* to Payne & Co., in satisfaction of the indebtedness of
Payne & Co. to Young.

The facts relating to the existence of judgments against
Blanchard and Armstrong are set forth in the opinion of this
court.

As to the question of interference, the facts as found by
the master may be stated as follows : There were two alleged
interferences, one known as the "Merriman Claim," the
other as the interference of the "Thomas P. Wharton," "David
Lewis" and "Richard Waln" tracts. The former was an east
and west interference and is sufficiently described in the opin-
ion of this court. The latter is a north and south interference
and it arose as follows :

The three tracts in question, viz. : the Nathaniel Levy,
Joseph Thomas, and Jacob Waln, are members of a block of
thirty-one surveys, known as the "Moore Wharton" block, of
which the Moore Wharton is the leading warrant. Although
termed a block, it was not surveyed on the ground as one
block, but was surveyed by different surveyors from different
points, about the same time. The Master reported that "on
this entire block of surveys but one undisputed monument is
found on the ground, to wit, a pine at the southwest corner of
the Nathaniel Levy tract. This pine is known as the 'Jos. J.
Wallis pine,' is a well established monument, and is relied on by
both parties as fixing the south-west corner of the Nathaniel
Levy tract and the north-west corner of the Joseph Thomas
tract."

[Holt's Appeal.]

The following draft shows the location of the three tracts in question, and of the Wallis pine :

The defendants produced evidence to show that the leading descriptive warrant, the Moore Wharton, one of the southern tracts in the block, was located upon the ground according to its description, and that numerous marks, calls and adjoiners, found on the ground at the present time, identify its location. They further produced evidence tending to identify the location of several of the tracts in the block, extending northward and westward from the Moore Wharton, by means of waters, monuments, and calls for older surveys. They further showed that there was not sufficient land between the Moore Wharton, on the south, as thus located, and the three tracts in question (as located by reference to the Wallis pine) in which to locate all the warrants called for in the block, by reason whereof an interference occurred between the three tracts in question and the Thomas P. Wharton, the David Lewis, and the Richard Waln tracts, these being the three northernmost tracts of the series in the block, which were surveyed and located with reference to the location of the leading warrant, the Moore Wharton. This alleged interference is shown by the draft on the opposite page.

Among other evidence adduced by the defendants to show that the Thomas P. Wharton, David Lewis and Richard Waln, were located as shown on the foregoing draft, was the following :—At the south-western corner of the John Rugg, where a chestnut is called for, a pine witness to a corner is found on this line, counting to date of surveys. At the north-west corner of same, where a pine is called for, a pine is found plainly marked as a corner and counting to date of survey. Several original line trees are found on this line. At this pine the line, according to the original survey, turns east, and such an original line is found upon the ground. At 320 perches east from this

[Holt's Appeal.]

NATHANIEL
LEVY

WALLIS

PINE   THOS P
WHARTON

JOSEPH
THOMAS

DAVID
LEWIS

RICHARD
WALN

JACOB
WALN

JOHN RUGG.   ELLY CANBY.

JOS. MORRIS.

MOORE
WHARTON

pine, and on this line, a *sassafras* corner is called for, and at 315 perches from this line a pine witness (presumably to this corner) is standing, and counts to the date of survey. The official re-. turns called for the sassafras as the common corner of the Thomas P. Wharton, the David Lewis, the John Rugg, and the Ella Canby tracts. Continuing on eastwardly 215 perches, about the official distance of the Elly Canby, the line is found to turn south, and pursuing this line south 228 perches, at about the official distance, is found an old white pine, with two hemlock witnesses, called for in the official returns as the south-east corner of the Elly Canby and the north-east corner of the Joseph Morris. Pursuing this line to the south, other trees are found, which, the defendants claim, correspond with corners of other tracts in the block, as called for by the official returns. They also showed that this location of the Moore Wharton and other tracts in the block is corroborated by streams and waters, corresponding in part with the official calls.

The plaintiffs, on the other hand, produced evidence of a marked line, about the distance of one tract to the south of the southern line of the Moore Wharton block, as located by the defendants, and they claimed that such line was the true southern boundary of the Moore Wharton block; and that, if there was any interference on the part of the Moore Wharton block, it was with tracts lying to the south. But they produced no corroborating evidence of marks, which answered any of the calls for the interior lines of tracts in said block.—

The master reported substantially as follows :—

1. Upon the whole case, as disclosed in the pleadings and proofs, a court of equity has jurisdiction to grant the relief prayed for.

2. That the interest in the lands in question was held by the defendants as partnership property, and as such it was not subject to the liens of judgments against the individual members of the firm.

3. The alleged rescission of the contract by the defendants was insufficient in law, and the contract still remains in force.

4. The deed from William Young to the defendants, filed with the master, was sufficient in law to convey to the defendants a good and marketable' title to the three tracts in question, such as was contracted for by the articles of agreement between the plaintiffs and the defendants.

5. The location of the three tracts in question, viz., the Nathaniel Levy, Joseph Thomas, and Jacob Waln, as claimed by the defendants, is clearly proved by the position of the "Wallis pine" and other marks on the ground.

6. If the southern boundary of the Moore Wharton block

were as claimed by the plaintiffs, there would be sufficient room to locate all the tracts in the block without an interference on the north with the three tracts in dispute. But the master finds but little evidence in support of such location, and he deems the same too unsatisfactory to warrant him in finding the location as claimed by the defendants.

On the other hand, the great preponderance of evidence is in favor of the location of the southern portion of the block as claimed by the defendants, " but some serious doubts exist as to its correctness."

7. Even if the said location, as claimed by the defendants, be adopted as the true one, yet there is still no interference as alleged, for the reason that, according to established rules of location, " there is no evidence in the case that will entitle the Thomas P. Wharton, David Lewis and Richard Waln tracts to take distance in a northerly direction, as against the Joseph Thomas and Jacob Waln tracts, which are located with reference to marks and monuments found upon the ground."

8. The defendants have therefore failed to establish the interference as alleged.

9. From all the evidence adduced, the complainant's case is a highly equitable one. The master, therefore, is of opinion that the plaintiffs are entitled to a specific performance of their contract with the defendants.

10. The master, therefore, recommended a decree that the said agreements be specifically performed, and that upon payment of the installments due, with interest thereon, to the plaintiff, William Young (in pursuance of the assignment of said agreement by E. R. Payne & Co. to him), the defendants shall take and receive the said deed from William Young to them, filed in the cause.

Exceptions filed by the defendants to the several findings of the master were dismissed by the court (MORROW, P. J.), and the decree, as reported by the master, was entered as the decree of the court. The defendants took this appeal, assigning for error the dismissal of their exceptions and the entering of the decree.

*A. O. Furst* and *S. R. Peale*, for the appellants.—A court of equity has no jurisdiction of a bill to compel specific performance, filed by a vendor against the vendee not in possession, where the only relief sought is the payment of purchase-money. In this case, the vendees complied with their part of the contract, tendered the first installment of the purchase-money on the day when due, and security for that to become due, and demanded a deed, which was refused. They thereupon

gave notice that they rescinded the contract; they tendered the value of the timber already cut by them, and surrendered the possession, which they had taken under the articles. Under these circumstances, a bill to enforce specific performance will not lie, damages at law being an adequate remedy: Kauffman's Appeal, 5 P. F. Smith 383. The plaintiffs were and are unable to convey a good and marketable title; hence a court of equity will not decree specific performance. The title of Payne & Co. was held by the individual members of that firm, under their agreement with Young, as *tenants in common*, and the interests of two of them were incumbered by judgments standing against them. It is said that Payne *et al.* paid for the lands out of partnership funds; but this alone will not vest the title to real estate in the partnership as to purchasers or mortgagees, however it may be as between the partners. It is essential to effect this result that the deed must be made to the partnership by apt words, and be recorded. In this case, the articles of sale were made from Young to the individual members of the partnership, " their heirs and assigns "—apt words to convey an estate in common. The agreement contains no mention of or reference to the fact that the vendees were partners.

The master and the court below held that as we agreed to purchase " all· the right, title and interest of E. R. Payne & Co." in the tracts in dispute, we could not insist upon receiving any other title than they had. But the same agreement described their title as " being the same tracts of land which were purchased by the said E. R. Payne & Co. from William Young," and under the agreement between Young and Payne & Co., the latter were entitled to a. title " in fee simple, clear of incumbrances," and we were thus substituted to their right.

As to the interference of · the Thomas P. Wharton, David Lewis and Richard Waln tracts, with those we agreed to purchase, the master found the facts in our favor, but reported as matter of law that the interfering tracts were not entitled to take the land as against the tracts purchased by us, and therefore such interference constituted no defense. But it is well settled that a marketable title in equity is one in which there is no reasonable doubt involved, either as to matter of law or fact; and such a title only will a purchaser be compelled to accept. The refusal of a court of equity to compel specific performance in such case, does not adjudicate the plaintiff's title, or lack of title; it only denies him an extraordinary remedy, applicable only to cases in no respect equivocal, and refuses to force the vendee, who here is not in possession, to accept an inevitable law-suit: Dalzell *v.* Crawford, 1 Parsons' Equity Cas. 44.

*R. P. Allen* and *Samuel Linn*, for the appellees.—Equity has jurisdiction in this case. The bill was filed to compel specific performance of an agreement, part of which relief was to secure the payments not yet due, and also to restrain the defendants from cutting timber, pending the litigation. An equitable ejectment would have accomplished just what the vendees desired—a cancellation of the contract. An action of covenant or debt would have been equally inadequate to secure the vendors' rights.

The attempted rescission of the contract by the defendants was futile. They allege no fraud in the agreement. After having taken possession and cut timber, they could not put the plaintiffs *in statu quo*. They allege that they surrendered possession, but we did not accept it. Both parties allowed the time to pass, which was fixed for the delivery of the deed and securing the purchase-money, and thereafter the time of performance became indefinite. They could not hold the plaintiff to a delivery of the deed on demand on a subsequent day without reasonable notice. It is sufficient that the deed be ready at the time the decree is made : Tiernan *v.* Roland, 3 Harris 429 ; Forsyth *v.* Oil Co., 3 P. F. Smith 168; Irvin *v.* Blakley, 17 P. F. Smith 24; Hatton *v.* Johnson, 2 Norris 219 ; Smith *v.* Webster, 2 Watts 478. The plaintiffs tendered a deed within a month after demand.

The objection that the title of Blanchard and Armstrong was incumbered by judgments was without foundation in law or fact. The evidence clearly showed, and the master so found, that the plaintiffs, constituting the firm of E. R. Payne & Co., held the lands as partnership real estate. Even if this were otherwise, the court could mould the decree so as to protect the defendants against the judgments. Moreover, the defendants only agreed to purchase the "right, title and interest" of Payne & Co. in the lands ; and the master properly found that this would be satisfied by a deed from the plaintiffs for such title as they had, without any warranty as to the quantity of acres or location, or that a better title was not outstanding to the whole or a part of the lands. This answers the objection as to the alleged outstanding title to one-sixth, and also as to the alleged interference.

In relation to the interference, the actual location on the ground of the three tracts in question, was conclusively proved and admitted. The location of the alleged interfering tracts was not proved, and the evidence of a paper interference was so uncertain as not to give rise to a reasonable doubt, sufficient to prevent a decree for specific performance.

Mr. Justice GORDON delivered the opinion of the court, October 3d, 1881.

This was a bill in equity, filed by E. R. Payne, W. H. Armstrong, Henry B. Smith and Edmund Blanchard, partners, trading under the firm name of E. R. Payne & Co., and William Young, against the appellants, Holt, Harris and Humes, for the purpose of compelling the specific execution of a contract for the sale of lands.

On the 24th of December 1872, William Young, one of the plaintiffs, by articles of agreement, covenanted to sell to Smith, Armstrong, Payne and Blanchard, three several tracts of land, situated in the county of Centre, containing each 415 acres, surveyed on three warrants, bearing date the 29th of April 1793, in the names respectively of Joseph Thomas, Jacob Waln and Nathaniel Levy. The consideration mentioned in the said agreement was $24,000, which the parties of the second part undertook to pay in certain installments as therein stipulated. Only part of this purchase-money was paid, hence, the deed was never executed by Young to his vendees. Afterwards, on the 17th of September 1875, Edmund Blanchard, for himself, and for William H. Armstrong, H. B. Smith and E. R. Payne, constituting, as he recites, the firm of E. R. Payne & Co., by an agreement, to which he affixed the several names of himself and his partners, agreed to sell to the appellants, " all the right, title and interest of the said E. R. Payne & Co." in and to the lands above mentioned, for the consideration of $22,000, payable in four payments of $5,500 each, which payments were to be secured, and the deed delivered, within thirty days from the date of the agreement. The writing thus executed by Blanchard was, on the day after its execution, ratified by Armstrong, Payne and Smith. Afterwards, on the 4th of August 1876, the parties above named assigned to William Young, their vendor, and he thus became interested to enforce the contract against the appellants, Holt, Harris and Humes, and, therefore, appears as one of the plaintiffs in this bill.

Concerning the final execution of the paper above mentioned, we find, from the master's report, the facts to be as follows : Within the thirty days no movement was made by either of the parties looking to a consummation of the agreement ; but about the time of the expiration of the period just mentioned, J. H. Holt went to Bellefonte for the purpose of executing the necessary papers and getting the deed, but failed to see Blanchard, who seems to have had this business in charge on the part of the firm. Shortly after this, Blanchard wrote to Holt, indicating a day for meeting, on which day Holt again appeared, but failed to find Blanchard. In the meantime, the defendants

had taken possession of the premises, and during the winter and spring following, cut and removed therefrom some 76,704 cubic feet of white pine timber, the stumpage of which, as the master finds, was worth $3,068.16. Again, about the last of May or first of June 1876, the defendants made another attempt to close up this contract with the plaintiffs. Several days before the first of June, Harris notified Blanchard that Holt would be prepared at that time " to fix matters up," but Blanchard answered that at that time he would be in Washington. Nevertheless, on the day thus appointed, Holt, Harris and Humes appeared at Blanchard's office with the money and bond necessary for a tender of performance on their part; but neither of the plaintiffs was then present. Finally, on the 3d of June, tender was made to Blanchard of $5,742, the payment then due, with a bond to secure the remaining payments, and, at the same time, demand was made for the deed. Blanchard declined to take the money, for the reason that he was not ready to make the deed. The defendants then, through Harris, informed him that they elected to rescind the contract, and that they then and there surrendered the possession of the land. At the same time a tender was made of $1,825 for the timber cut upon, and removed from, the premises. On the 7th of June a like tender was made by Humes to Payne, and, at that time, Payne expressed his willingness to receive the money, but said they were not ready to deliver the deed, as it was to come through Young, and that it would be ready on the following Friday. To this Humes answered, that they expected the deed to come from E. R. Payne & Co., and if they were not ready to make it they would rescind the contract. He also stated that they, the defendants, had restored the possession of the land, and tendered payment for the stumpage.

Then, on the 15th of July following, the plaintiffs tendered to the defendants two deeds, one from William Young to E. R. Payne & Co., the other E. R. Payne & Co. to the defendants. These deeds were both dated June 26th 1876, and purported to convey the land described in the contract.

This tender was refused for two reasons :—(1) That the whole title to the land was not in Young; (2) That the premises were incumbered by judgments against Blanchard and Armstrong, individual members of the firm of E. R. Payne & Co.

The above embraces a brief statement of the transactions of the parties contestant down to the 15th of July 1876, and we now turn to the defence of the appellants as found in their answers, and to the exceptions taken, by them, to the decree for specific performance as entered by the court below. These answers assume four distinct points of defence, three of which

have been revealed in the preceding statement, viz. :—The rescission of the contract; the want of a full title in Young, and the incumbrance of the lands by the judgments against Armstrong and Blanchard.

The fourth point is, that these tracts of land which the plaintiffs agreed to convey, are so interfered with by other surveys that, as to a large portion of them, the plaintiffs can make no title. The first two of these points cannot be sustained. Had the defendants within, or at the end of, the thirty days specified in the contract, insisted upon an execution of it or the alternative of a rescission, on a refusal of the first they would have been entitled to the second, but in that event they must have withdrawn from the possession of the land. But they did no such thing. Whilst they at that time offered to fulfill their part of the contract, and demanded the deed from the plaintiffs, they did not propose to rescind, but continued to occupy the land, and to cut the timber growing upon it.

When, therefore, afterwards, in June following, they made their tender, announced their withdrawal from the possession of the premises, and demanded a deed, or the alternative of a rescission, they were bound to give the plaintiffs a reasonable time within which to comply with their part of the contract. The appellants could not, at that time, fall back upon the time fixed in the agreement for performance; that time had gone by, and they had by their own act, by continuing their possession, elected to treat the contract as of force. After this they could not abrogate this contract until, on full notice of their intention, and after the expiration of a reasonable time for performance, their vendors had failed to meet their agreement. But in June, 1876, when the defendants made their tender and demanded a rescission, they knew the plaintiffs were not prepared to make a deed; that a conveyance must first be made from Young, who, as appears from the assignment, resided in the county of Montgomery, and we, therefore, think, with the learned master, that the tender of the deeds on the 15th of the succeeding month was in time, that the delay was not unreasonable, and that a rescission cannot be pronounced on this ground.

As to the exception taken to Young's title, in the second point, we do not think it can be sustained. The only defect alleged is that the deed of Hand and Costen was not delivered until after Hand's death. But the equitable title was then in Young; he had paid the purchase-money in full; hence his vendors held the legal title in trust for him, and the deed having been executed for the purpose of delivery, in pursuance of the legal duty devolving upon them, its delivery after Hand's death by Costen, the tenant in common with Hand, or by Post, in whose

hands it was left, was a good and lawful delivery: Stephens v. Huss, 4 P. F. S. 20.

As to the effect of the judgments against any or all of the appellees, as liens upon the lands sold, we cannot adopt the opinion of the learned auditor. Under the articles with Young, of the 24th of December 1872, the equitable title vested in Smith, Armstrong, Payne and Blanchard as tenants in common ; hence, a judgment against either, during the time of the existance of the title in them, would bind his interest. The question is not one of trust, but a purely technical one of title. These parties could receive the title in such form as they saw fit ; it might be, as it in fact is, to them as tenants in common, or it might be to the partnership. As for themselves there was no particular difference. In either case they might use the land as part and parcel of the assets of the firm, or they might divide it among themselves and hold it in severalty, but as to judgment creditors and mortgagees the face of the conveyance determined the character of the title, and, as to these, it could not be altered by parol. All the parol testimony produced in this case may be admitted and yet not alter the result. Let it so be that the property was bought for the use of the firm ; that whatever money was paid on account of it was partnership money, and that it was actually used by and for the firm, yet all this is but a restatement of the facts as found in the case of Ridgway, Budd & Co.'s Appeal, 3 Har. 177; the appeal of the Second National Bank of Titusville, 2 Nor. 204, and Geddes' Appeal, 3 Nor. 482. In the case last named the title was an equitable one, and it, therefore, covers the case in hand in every particular. It is indeed true, as in Erwin's Ap., 3 Wr. 535, that when one partner buys land with the firm money, and takes the title in his own name, there is a resulting trust to the firm. And in Lefevre's Ap., 19 P. F. S. 122, Mr. Justice SHARSWOOD, in commenting upon Erwin's Ap., says, that the same result must follow logically where, in a firm of three or more, two of the partners or any number less than the whole, make such purchase with partnership funds. Had, therefore, the name of Blanchard been omitted from the articles with Young, the conclusion of the auditor might be sustained. But it was not omitted. Young's agreement is to convey to every member of the firm, hence, there can be no resulting trust, since no partnership trust was violated. It is true, Blanchard did not sign the agreement, but this did not affect his right as a tenant in common ; that was a matter for Young ; if he chose to accept the covenant of one or more of his vendees in lieu of all, that was his own business, and that did not alter his agreement to make title to the whole number of the persons named. Blanchard might have repudiated

[Holt's Appeal.]

the contract, so far as he was concerned, but this he did not do; on the other hand, he ratified and approved the act of his associates by joining in the agreement to convey to the appellants.

It follows, that provision should have been made in the decree of the court below for the payment of the first three judgments against Blanchard, as found on the master's list, amounting, in gross, to the sum of $2,129.83, for these judgments, having been entered prior to the date of the sale to the defendants, were a lien on the land. The other judgments, having been entered after the sale, were a lien only on the purchase-money owing to the plaintiffs, and require no consideration, since the decree properly awards the whole of that purchase-money to the superior lien of Young.

We now come to the final question presented for our consideration, that is, the character of the title tendered to the appellants, and which, by the decree of the court, they are required to accept. The appellants contend that it is of a character so defective and doubtful that equity will not compel them to accept it, and in this we think they are correct. We regard Young's title as unmarketable and such as no prudent vendee ought to accept. We need not here stop to analyze the contract between Payne & Co. and the defendants, for if it is as the appellees contend, but an assignment of the right, title and interest of that firm in the Young contract, the defendants, nevertheless, stand in the place of Armstrong, Smith, Payne and Blanchard, and have a right to such title as is provided for in that contract. On this assumption, and by virtue of the assignment to him of the contract first above mentioned, Young becomes the immediate vendor of the appellants. But Young, by his agreement, undertook to execute a good and sufficient deed, or deeds, in fee simple, for the premises described, and such a deed or deeds, must he execute and tender to the defendants before he can, by the present process, compel them to pay the purchase-money. Under this view of the case, the refusal of Blanchard to warrant against the Merriman claim, becomes of no moment, for there was no such refusal on part of Young. He was bound to make a good title to the whole of the premises, and it is his title which, if the decree of the court below were enforced, the defendants would be obliged to take.

But the Merriman, or what is a better designation, the Jesse Waln interference, does, if we are to believe the evidence, affect Young's title as to a material part of the Nathaniel Levy tract. These tracts, with others of the same block of surveys, known, from the leading warrant, as the Moore Wharton block, were surveyed at the same time, hence, the location of the one cannot have preference over the other. The west

line of the Levy and the east line of the Waln are found upon the ground, and thus the location of the tracts are definitely fixed. But, by actual measurement, the distance between these lines falls short of the official call some eighty-six rods, hence, each of these tracts must lose forty-three perches, the one from its east and the other from its west side. As this reduces the Levy tract about one-seventh of its whole amount, this loss, especially if the land were timbered, may be regarded as material.

We must, also, differ with the court below as to the interference of the Thomas P. Wharton tract with the Joseph Thomas. The master concedes that the evidence largely preponderates in favor of the defendant's location of the Rugg tract, the adjoinder of the Wharton on the south. To us, indeed, it seems that the north line of this tract, running from the pine stub to the pine witness, is well established. If, however, this be so, then all that is necessary for the establishment of the defendant's location of the Thomas P. Wharton tract is the fixing of the original position of the sassafras, the common official corner of the Rugg, Canby, Wharton and Lewis tracts. To us, this would not seem a task of much difficulty. Following the well-marked line from the pine stub, the north line of the Rugg and Canby tracts, at the official distance for the north-east corner of the Rugg, the pine witness is found, and if this pine is indeed a witness, and is found at the proper position for the north-east corner of the Rugg, and the north-west corner of the Canby tract, it must surely be a witness to that corner, and as the official survey declares that the corner there made, at the time of the survey, was a sassafras, the conclusion is next to irresistible that that is the place where the sassafras once stood. Taking this point as settled, and we have established the south line, and the south-east corner, of the Thomas P. Wharton, and from these the location of this tract is readily determined. Moreover, whilst calls for adjacent surveys, and the notation of waters are not the best evidence of a survey, they are, nevertheless, corroborative, and may help to settle a doubt, and, in this case, both these favor the location contended for by the defendants.

Thus, whilst we do not undertake to pronounce positively upon this question, a question that can only be definitely disposed of by a jury, yet without hesitation we can say that Young's title is not good and marketable, or such as the defendants are bound to accept.

The decree of the court below is now reversed and set aside, and the bill of the plaintiffs dismissed at their costs.